# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| RONALD G. SUGGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-01064-JEO |
| | ) | |
| SAM'S EAST, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this action, Plaintiff Ronald G. Suggs brings claims against his former employer, Sam's East, Inc. ("Sam's"), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA") and the Alabama Age Discrimination in Employment Act, Ala. Code § 25-1-20 et seq. ("AADEA"). (Doc. 8).[1]  Now before the court[2] is Defendant's motion for summary judgment. (Doc. 25).  The motion has been fully briefed, (docs. 26, 32, 34), and is ripe for

---

[1] References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files ("CM/ECF") system.  Unless otherwise noted, page citations to briefs, evidence, and other papers in the court file are to the page number of the electronically filed document, which may not coincide with pagination on the original "hard copy."  However, pinpoint citations to all depositions are to the page of the deposition transcript.

[2] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 16).

decision.  Also before the court is Defendant's motion to strike.  (Doc. 33).  It too is fully briefed, (docs. 37, 38), and ripe for decision.  For the reasons that follow, the motion for summary judgment is due to be granted in full.  The motion to strike is due to be granted in part and mooted in part.

## I.  MOTION TO STRIKE

"A district court has broad discretion in determining the admissibility of evidence" on a motion for summary judgment. *Hetherington v. Wal-Mart, Inc.*, 511 F. App'x 909, 911 (11th Cir. 2013).[3]  The nonmoving party is not required to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The Eleventh Circuit has "read this statement as simply allowing otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (citing *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1017 (11th Cir. 1987)) (emphasis omitted).

"The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322-25 (11th Cir. 1999) (footnote, internal quotations, and citations omitted).  However, as

---

[3] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

explained above, a district court may consider a hearsay statement in deciding a motion for summary judgment if the statement could be "reduced to admissible evidence at trial":

> [T]he phrases "reduced to admissible evidence at trial" and "reduced to admissible form" [are used] to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose. For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

*Id*. at 1323–24 (footnotes omitted).

Defendant moves to exclude two[4] statements from the court's consideration on summary judgment. First, Defendant seeks to exclude portions[5] of Plaintiff's testimony regarding a telephone conversation between him and Christopher Simmons.[6] (Doc. 33 at 6; Doc. 38 at 2-4). Second, Defendant seeks to exclude a statement in Plaintiff's brief that "Defendant's Club Manager, Lisa Lewis, issued a

---

[4] In its motion, Defendant also moved to exclude a third category, namely comments allegedly made by Simmons and Lewis and overheard by Rogers. (Doc. 33 at 1-6). In its reply, however, Defendant withdrew the motion with regard to these comments. (Doc. 38 at 1-2).

[5] Defendant does not object to the inclusion of the fact of the telephone call or that Simmons apologized to Plaintiff during the call. (Doc. 33 at 6).

[6] Plaintiff reported to Club Manager Lisa Lewis, an African American over the age of 40, and Overnight Assistant Manager Christopher Simmons, an African American under the age of 40. (Doc. 27-1 ("Suggs Dep.") at 31-32, 55, 87).

vendetta to get rid of him after he called her out for racism." (Doc. 33 at 6-7; Doc. 38 at 4-5). The court discusses each statement in turn.

### A. Telephone Conversation Between Plaintiff and Simmons

Defendant moves to strike the following testimony from Plaintiff's deposition regarding a telephone call between him and Simmons:

- Simmons told Plaintiff that "when he was hired he said my very first orders from Lisa was to do anything and everything to get you out of there. . . . [H]e said he was - he was under direct orders." (Suggs Dep. at 113).

- "One of the things he said was he related a conversation that Lisa and I had had that I have – I have absolutely no recollection of. But in something we were saying, Lisa had made a remark, and I told her, you may want to be careful how you say that to the associates because it could be construed as racial discrimination. To be careful. And he said when he – when Lisa hired him, his exact words to me was [sic], get rid of him; ain't no old white guy going to tell me what to do." (*Id*. at 114).

- "I have no recollection of [the conversation with Lisa Lewis]. Like I said, the way I – he said you had – it was just one of those things she said you had just made a suggestion that she may want to rephrase – you know, she may want to rephrase what she said because what she was saying, the way she was saying it, could be misconstrued as racial discrimination." (*Id*.).

- ". . . I'm relying on what he told me. I do not remember the conversation [with Lewis]." (*Id*. at 115).

- "And if I said anything like that to her, it was with the best of intentions. I was trying to keep her from saying something that would get somebody else upset. It wasn't – it wasn't trying to say anything racially motivated or anything. But it couldn't have been a major conversation because I have no memory of it." (*Id*.).

- Q: "Do you know that it [the conversation] happened?"

  A: "No, I don't. Like I said, I don't recall it at all. I just know that's what CJ [Simmons] told me that he was instructed with Lisa when she hired him. That I was number one on the list. I was – his job was to get rid of me." (*Id.*).

As background, this call took place after Simmons had been terminated from Defendant, and the only testimony regarding the conversation is Plaintiff's testimony – there is no testimony from Simmons in the record. There is also no testimony from Lewis in the record. Defendant contends that this testimony is inadmissible double hearsay. (Doc. 33 at 6; Doc. 38 at 2-4). Plaintiff responds that the testimony is admissible under Federal Rule of Evidence 801(d)(2)(D) as an admission by a party opponent. (Doc. 37 at 1-3).

Under the Federal Rules of Evidence, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). As a general rule, "[h]earsay is not admissible except as provided by these rules . . . ." Fed. R. Evid. 802. Hearsay within hearsay, or so-called "double-hearsay," is admissible only if each part of the combined statements conforms with an exception to the hearsay rule. Fed. R. Evid. 805. Excepted from the definition of hearsay is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," which is deemed an admission by a party opponent. Fed. R. Evid. 801(d)(2)(D). Thus, statements made

by a supervisory official who plays some role in the decision-making process are generally admissible. *See, e.g., Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1208 (11th Cir. 2013); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 873–75 (11th Cir. 1985).

As Defendant points out in its reply brief, Plaintiff's statements present a classic "double hearsay" problem. Both Lewis' alleged statements to Simmons and Simmons' alleged statements to Plaintiff were made out of court. Additionally, Plaintiff is clearly offering them for the truth of the matter asserted – that is, that Lewis wanted Simmons to get rid of Plaintiff because of his race and age and that Plaintiff had a conversation with Lewis regarding rephrasing a discriminatory remark. As such, both statements must satisfy an exception to the hearsay rule. They cannot.

Plaintiff's argument that the statements should be allowed under the exception for admissions of a party-opponent in Rule 801(d)(2) is incorrect. First, as to the statements between Lewis and Simmons, the conversation could arguably constitute an admission of a party opponent. But the problem here is that Plaintiff is the only person who testified regarding these statements. There is no evidence in the record from Simmons or from Lewis. So, to the extent that the first layer of hearsay could come under the Rule 801(d)(2) exception, there is no exception to cover the second layer. In other words, because it is the Plaintiff's statement, and not Simmons' statement, Plaintiff must identify an additional exception to the rule

against hearsay. *See Kidd v. Mando*, 731 F.3d 1196, 1208 n.15 (11th Cir. 2013) (even if plaintiff could demonstrate a statement was an admission by a party opponent, the statement would not automatically be admissible because someone else relayed the statement). Plaintiff does not, and cannot, identify such an exception.

Second, as to the statements regarding the alleged conversation between Plaintiff and Lewis, although Plaintiff could testify himself regarding the comment he allegedly made to Lewis regarding perceived racial discrimination, Plaintiff testified he did not remember making the comment. In fact, Plaintiff testified that he had to rely totally on Simmons' recollection of the comment: "I'm relying on what [Simmons] told me. I do not remember the conversation [with Lewis]." (*Id.* at 115). As such, Plaintiff's testimony regarding this alleged statement is inadmissible hearsay. For these reasons, the motion to strike as it relates to the above testimony is due to be granted.

## B. Vendetta Statement

Defendant also seeks to exclude a statement in Plaintiff's brief that "Defendant's Club Manager, Lisa Lewis, issued a vendetta to get rid of him after he called her out for racism." (Doc. 33 at 6-7; Doc. 38 at 4-5). Defendant argues that Plaintiff makes this statement without any citation to the record, "does not identify to whom Lewis allegedly issued such vendetta, there is no testimony that Lewis made such a statement to Plaintiff, and, as such, the statement is unsupported and

due to be stricken." (Doc. 33 at 6-7). In response, Plaintiff argues that "[t]his statement was made in the Plaintiff's concluding paragraph to its Response in Opposition to the Defendant's Motion for Summary Judgment and acts as a brief synopsis of Defendant's actions." (Doc. 37 at 3). Plaintiff maintains that the evidence supports his "synopsis." (*Id*.).

It is axiomatic that statements by counsel in a brief, without support from the record, are not evidence. *Skyline Corp. v. N.L.R.B*., 613 F.2d 1328, 1337 (5th Cir. 1980).[7] The court considers the evidence before it and not synopses or opinions by counsel as to what the evidence is or what conclusions should be drawn from it. In light of the standard the court employs in making its determination on a motion for summary judgment, the motion to strike, as it relates to this statement made by counsel for Plaintiff in his opposition brief, is due to be denied as moot.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary

---

[7] *See Bonner v. City of Prichard, Ala*., 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## III.  STATEMENT OF FACTS

Plaintiff Suggs, a Caucasian, was hired by Defendant in its Oxford, Alabama, location as a supervisor in the Receiving Department.  (Suggs Dep. at 27, 106). Suggs was fifty-seven years old when he was hired. (*Id*. at 28; Doc. 8 ¶ 57).  His job duties included the following: receiving early morning deliveries; receiving

FedEx and UPS deliveries; maintaining a chain of custody on valuable items; ensuring cleanliness and maintenance in the Receiving area; delivering items to the store floor; assisting night associates in the department; maintaining forklift equipment; and certifying forklift drivers. (Suggs Dep. at 35-36, 41). Several employees reported to him, including a Receiving Team Associate who assisted during the day and a Receiving Clerk who helped with paperwork to ensure everything was correctly processed. (*Id*. at 37). At all relevant times, Plaintiff reported to Club Manager Lisa Lewis, an African American over the age of 40, an Overnight Assistant Manager Christopher Simmons, an African American under the age of 40. (*Id*. at 31-32, 55, 87).

According to Plaintiff, Lewis maintained a clique of people who she liked and supported. (Doc. 27-5 ("Rogers Dep.") at 15-16). This clique consisted of multiple employees of different races, both Caucasian and African-American, and ages, both over and under the age of 40. (*Id*. at 16-21). Plaintiff contends that Lewis was not a "by the book" employee, was unethical, and unprofessional. (*Id*. at 15-16). For instance, Lewis yelled at employees and reprimanded employees in front of others, instead of having a private conversation. (*Id*. at 60). Lewis also made racially insensitive or inappropriate comments to and about random associates such as, "white ass, her white ass, . . . black ass," and "white trailer park trash." (*Id*. at 25, 52).

Although Plaintiff believed that he and Lewis had a good relationship, (Suggs Dep. at 115-16), Asset Protection Manager Tamala Rogers, a Caucasian over the age of 40, testified that Lewis wanted to find a way to terminate Plaintiff. (Rogers Dep. at 26-27, 52-53). Specifically, Rogers testified that she overheard a conversation between Rogers and Simmons:[8]

> She was out to get Ron, you know she had made comments about how, you know, we got – you need to coach him out. You need to find stuff to coach him to and coach him out. I even remember her making a comment one time about he was too old to be doing this job. He needed to find something else to do, or, you know, we need to do [sic] get rid of him.

(*Id*. at 26).

## A. Coaching for Improvement and Plaintiff's Disciplinary History

Sam's maintains a progressive discipline policy called Coaching for Improvement. (Def. Exh.[9] 2 to Doc. 27-2 ("Coaching for Improvement") at 6-9; Suggs Dep. at 48-49). The Coaching for Improvement program is used for both job performance, violations of company policies, or conduct that "interferes or creates a risk of interfering with the safe, orderly and efficient operation of [Sam's] business." (Coaching for Improvement at 50). The Coaching for Improvement program consists of a first written coaching, a second written coaching, a third written coaching, and

---

[8] Defendant moved to strike this testimony as hearsay, but specifically withdrew the motion as it pertained to Rogers' testimony. (Doc. 33 at 1-6; Doc. 38 at 1-2).

[9] "Def. Ex." is a reference to Defendant's exhibits that are attached to Plaintiff's deposition.

then termination of employment for a fourth written coaching within any 12-month period. (*Id*. at 50-51; Suggs Dep. at 48-49). Based on the severity of the conduct, however, steps in the Coaching for Improvement program can be skipped, up to and including immediate termination. (Coaching for Improvement at 50, 52). The program may also include investigations of reported or potential misconduct. (*Id*. at 51). Employees are required to cooperate with the investigations and it allows for suspensions or transfers during such investigations. (*Id*.). If at any time during a 12-month period an employee had a second or third written level of coaching, that employee "may not be eligible for promotion or transfer." (*Id*. at 50).

On April 10, 2017, Overnight Assistant Manager Simmons issued a First Written Coaching to Plaintiff for poor job performance.[10] (Doc. 27-2 at 10-11). The coaching detailed incidents where work was not completed in a timely manner and warned that Plaintiff "must perform at a supervisor level and it has to improve immediately. Failure to not complete tasks and failure to not perform at a supervisor level will result in more disciplinary action." (*Id*.). Plaintiff recalled Simmons telling him, "as a supervisor, I expect you to do everything I want done." (Suggs Dep. at 56-57). Plaintiff described the coaching as follows:

---

[10] Before 2017, Plaintiff had only one other written coaching, which occurred on October 11, 2015, but expired before the relevant time period. (Suggs Dep. at 54).

> I thought it maybe was because he was new[11] at the job and trying to learn that area. He had never done overnight before. Because I found myself having to do more and more to try to help the overnight crew to try to get caught up and try to get the floor cleaned before 7:00 o'clock, which didn't allow me to get my stuff put up in time for the 7:00 o'clock deadline.

(*Id*. at 57). Plaintiff disagreed with Simmons' description of his performance as detailed in the First Written Coaching. (*Id*. at 60-66). Because of the way Simmons wanted everyone to work, the overnight employees struggled to keep up and were frustrated with Simmons. (*Id*. at 59-60). Plaintiff did not know if anyone else was disciplined for similar issues during this period. (*Id*. at 60). At the time he received the coaching, Plaintiff did not feel that he was being discriminated against; instead he felt it was unreasonable. (*Id*. at 70-71).

About two months later, on June 8, 2017, Simmons issued Plaintiff a Second Written Coaching for poor job performance. (Doc. 27-2 at 12-13). Much like the first coaching, this coaching detailed Simmons' belief regarding Plaintiff's failure to follow instructions in various situations over approximately a two-week period. (*Id*.). Plaintiff disagreed with the coaching and wrote in response, "I feel I am being targeted by my manager for some reason I don't understand." (*Id*. at 13).

---

[11] Plaintiff testified that Simmons had been in this position for approximately two weeks when he received this First Written Coaching. (Suggs Dep. at 54-55).

After this coaching, Plaintiff spoke with Club Manager Lewis. (Suggs Dep. at 78-79). She told Plaintiff not to worry and that she "had [his] back." (*Id*. at 79). Plaintiff asked Lewis "to remove one of the coachings because they were not – especially the first one – because it was not – it was not a justified coaching. And she said, I will talk to [Simmons], and . . . I am watching out for you." (*Id*.). Plaintiff does not know if Lewis ever spoke with Simmons. (*Id*.).

On August 14, 2017, Asset Protection Manager Tamala Rogers, a Caucasian over the age of 40, issued Plaintiff a Third Written Coaching.[12] (Doc. 27-2 at 22-23). This coaching related to Plaintiff's failure to follow Lewis's July 20, 2017 directive to have her conduct a final safety check before certifying any forklift drivers.[13] (*Id*.; *see also* Doc. 27-2 at 14). Despite these instructions, on July 31, 2017, Plaintiff certified a forklift driver without Lewis conducting a final safety check. (Doc. 27-2 at 16-17). The unauthorized forklift driver caused an accident while driving the forklift, resulting in damage to a freezer. (Suggs Dep. at 84). Plaintiff testified that he "accepted full ownership of it. This was the one time when I said, yes, I was in the wrong in doing this. I made a mistake . . . the one, I accepted. This one was justified." (*Id*. at 85).

---

[12] Rogers testified that she did not agree with this coaching, but that she "was made to do it anyway." (Rogers Dep. at 22).

[13] Specifically, on July 20, 2017, Lewis sent an email to Plaintiff and others stating: "Going forward no one can be get [sic] certified on a lift until I personally approve it. I have to ensure that the associate is trained properly and that they are ready to be on the lift. . . ." (Doc. 27-2 at 14).

## B. Events Leading to Plaintiff's Termination

On September 5, 2017, Lewis called Plaintiff to her office. (*Id*. at 92). Lewis told Plaintiff that she "wanted everything done better, faster, and everything that was being expected of [Plaintiff], she wanted it all done before [the store] opened in the mornings. (*Id*.). Plaintiff told Lewis that the expectations were more than could be met, but she did not understand what he was saying. (*Id*. at 96). Plaintiff described the meeting as "a good old fashioned chewing out." (*Id*.).

Plaintiff left the meeting and stopped in the Personnel Office where Jennifer McCann, the Personnel Training Coordinator, and Bookina Caver, the Receiving Clerk, were having a conversation. (*Id*. at 99-100). When they asked if he was okay, Plaintiff told them he "had just gotten chewed out by Lisa [Lewis] for not getting [his] work done." (*Id*. at 101). Plaintiff testified as follows when McCann and Caver asked Plaintiff if he was mad:

> A. . . . And I said, no. I said, I'm upset. And then I told them, I related the situation. I said, you will never ever see me mad because of something that happened when I was 15. And it scared me enough that – from that point on, I knew I didn't want to lose my temper in that way.
>
> ***
>
> Q. What specifically did you tell them about this incident when you were 15?
>
> A. I shared with them the time where I saw – I was – we were going to band practice. And there was a young man who was physically picking on some younger girls. Pushing them around. Saying some very

violent things. And I told him to stop. And he continued on. And I grabbed him by the throat. And I had to have a couple of friends to pull me off him. And I was afraid I was going to hurt him. I was afraid I would have killed him. That was just me at that point as a 15 year old.

And that scared me enough from that point on, I have never – I have never gotten mad like that again. It has helped me become – that one situation helped me become more objective and more pragmatic, I guess.

I always – I always find myself now, if I'm in a situation, even if it means losing – you know, getting angry, I will ask myself, is that going to change the outcome? And if the answer is, no, which is usually is, I just don't get angry about it. I just either accept it or see what I can change.

\*\*\*

That is what I tried to share with them. They will not see me mad again. I may get upset, but you will not see me mad.

(*Id*. at 102-03).

Plaintiff's statement alarmed McCann and Caver. (Doc. 27-3 ("McCann Dep." at 28; Doc. 27-4 ("Caver Dep.") at 35). McCann reported Plaintiff's comments to Lewis, and Lewis submitted the concern to Sam's Global Ethics Team through the Ethics Hotline. (McCann Dep. at 28-30; Doc. 25-5 ("Cizerle Decl.") ¶ 5). The report led to an investigation which was overseen by Ethics Manager Fashia Cizerle. (Cizerle Decl. ¶ 6). Cizerle oversees Ethics investigations and makes an "accountability recommendation" at the conclusion of an investigation as to the level of coaching an employee should receive under the Coaching for Improvement Policy. (*Id*. ¶ 4). When making a recommendation, Cizerle weighs several factors,

including an evidence that the involved individuals may have colluded to fabricate allegations, whether there are corroborating statements from multiple sources or if a single source is making an allegation, any previous Ethics investigations of a similar nature involving the same employee, extenuating circumstances such as evidence that the employee may have been joking, angry or upset, and, finally, whether the subject of the investigation is a supervisor or hourly employee. (*Id.*).

To begin the investigation, Cizerle directed Lewis to obtain statements from Plaintiff and every witness to the incident. (*Id.* ¶ 7). Plaintiff, McCann and Caver wrote statements regarding what had happened. Plaintiff's statement was consistent with his testimony. In pertinent part, Plaintiff wrote:

> On September 5th after a counseling conversation with Lisa [Lewis], I spoke with Jennifer [McCann] and Bookina [Carver] upstairs. I was upset after the conversation. Not mad, just upset. And shared an incident as a teenager that I should not have shared. And I didn't share it in completion, so it sounded threatening. I shared that I didn't ever want to get so upset that I would get made like I did many years ago.

(Doc. 27-2 at 24). McCann's statement said:

> Ron was standing at the door of the PTC office and said "[Bo]kina it is nothing personal but you are going to meet a different person tomorrow. Lisa said I have to be the biggest, baddest, son of a bitch. You've never seen me mad before. The last time I was mad was when I was in high school. And he still has the scars on his neck. It took three guys to pull me off. I was just watching his eyes fade away.

(Doc. 27-3 at 23). McCann testified that she thought the statement was threatening, but not directed at her personally. (McCann Dep. at 18). Instead, she believed that

maybe it was threatening "to whoever did whether it was Lisa of Christopher Simmons that – that wrote him up." (*Id*.).

Caver's statement mirrored McCann's statement:

> I was in the PTC office (Jennifer) on lunch. Ron the receiving lead state if he comes in tomorrow with a different attitude it wasn't nothing against me, but he stated Lisa told him to be the biggest bad[d]est son of a bitch and take ownership of receiving. He also stated that I have never seen him angry before, the last time he was angry it took three men to get him off someone that he still ha[s] the scar[]s around his []neck to this day.

(Doc. 27-4 at 29). Caver testified that she "took it that he could have really hurt somebody in that moment." (Caver Dep. at 35).

Cizerle reviewed the statements and found McCann and Caver's statements to be consistent in their description of what occurred. (Cizerle Decl. ¶ 8). Cizerle also noted that Plaintiff admitted to the statements reported by McCann and Caver. (*Id*.). Cizerle reasoned that although Plaintiff did not direct his comments at anyone specifically, McCann and Caver perceived the comments as threatening and Plaintiff admitted that they "sounded threatening." (*Id*. ¶ 8, 11). Cizerle considered the fact that Plaintiff was the Receiving Team Lead and supervised at least two other employees, including Caver who was a witness to the comments. (*Id*. ¶ 9). Cizerle

concluded that Plaintiff's statements violated the Inappropriate Conduct portion of the Statement of Ethics[14] and the Violence Free Workplace policy.[15]  (*Id*. ¶¶ 11).

Because of this conclusion, Cizerle was required to make an "accountability recommendation."  (*Id*. ¶ 12).  Cizerle recommended a Third Written Coaching for Plaintiff.  (*Id*.).  The recommendation was based on the following: (1) the specific statements made by Plaintiff; (2) Plaintiff's admission that he made the statements; (3) his position as a supervisor and that the comments were made to one of his subordinates; (4) his admission that he was upset when he made the statement; and (5) written coachings issue to other employees in supervisor positions who committed similar violations.[16]  (*Id*. ¶ 13).  Cizerle made this recommendation

---

[14] The Inappropriate Conduct portion of the Statement of Ethics states: "We believe in maintaining a working environment free of inappropriate conduct such as obscene, profane, gross, violent, discriminatory, bullying or similarly offensive language, gestures or conduct."  (Doc. 27-7 at 23).

[15] In relevant part, the Violence Free Workplace policy states:

> We prohibit any form of violence or threat of violence in or affecting the workplace, other associates or our customers/member.  This includes, but is not limited to, any conduct or communication (whether direct or indirect) which: 1) harms, damages, injures, harasses, intimidates, bullies, threatens, stalks, taunts, forces, coerces, restrains or confines another person; 2) reasonably causes another person to fear for his/her health or safety; or 3) intentionally harms or damages property.

(Doc. 27-7 at 55).

[16] Plaintiff "disputes" this last fact stating that "there is no evidence showing what other associates and what other 'similar' acts were used as a basis for comparison to the Plaintiff."  (Doc. 32 at 5).  While the court generally agrees with Plaintiff's statement, Plaintiff does not cite to any evidence that contradicts Cizerle's testimony that she used such evidence as part of her reasoning for issuing Plaintiff a Third Written Coaching.  (*Id*.).  Statements and arguments made by counsel in brief, without citation to evidence to support them, are not evidence.  *Skyline Corp.,* 613 F.2d at 1337.

without reviewing Plaintiff's previous coaching history. (*Id*. ¶ 12). She also did not know the race or age of any of the individuals involved in the incident or whether any of them had ever made a complaint of discrimination. (*Id*. ¶ 15).

Cizerle emailed Lewis and informed her of the recommendation of a Third Written Coaching for Plaintiff based on her investigation. (*Id*. ¶ 14). At that point, Cizerle asked for Plaintiff's then-current coaching level and Lewis responded that he was "on a 3rd written." (*Id*.). Cizerle replied, "[u]nfortunately this will mean termination for him." (*Id*.). Based on this recommendation, Lewis terminated Plaintiff's employment. (Suggs Dep. at 130-31). Plaintiff did not complain to anyone at Defendant or appeal the termination decision. (*Id*. at 132-33).

### C. Aftermath of Plaintiff's Termination

As discussed above in the section regarding the Motion to Strike, Plaintiff received a telephone call from Simmons at some point after Plaintiff's termination. (Suggs Dep. at 113-14). Simmons himself had been terminated and asked Rogers for Plaintiff's phone number. (Rogers Dep. at 51). Among the other statements struck by the court, Simmons apologized to Plaintiff for what happened between them while they were employed by Defendant. (Suggs Dep. at 113).

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 6, 2017, alleging race and age

discrimination.[17]  (Doc. 27-2 at 58-59).  The EEOC issued a Dismissal and Notice of Rights on April 9, 2018.  (*Id*. at 67).  Plaintiff timely filed his complaint on July 10, 2018.  (Doc. 1).

## IV.  DISCUSSION

Plaintiff contends he was discriminated against because of his race and his age, in violation of Title VII, the ADEA and the AADEA.[18]  (Doc. 8 ¶¶ 13-46, 54-73, 74-83).  He also contends that he was retaliated against in violation of Title VII.  (*Id*. ¶¶ 47-53).  The court first addresses his discrimination claims and then moves on to his retaliation claims.

### A.  Discrimination Claims

Discrimination claims can be categorized as either single-motive or mixed-motive claims.  *Quigg v. Thomas Cnty Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir.

---

[17] The EEOC Charge does not allege retaliation.  (Doc. 27-2 at 58-59).

[18] It is not clear in the Eleventh Circuit whether a plaintiff may simultaneously pursue claims under the AADEA and ADEA. *Compare Collins v. Compass Group, Inc.*, 965 F. Supp. 2d 1321, 1331-32 (N.D. Ala. 2013) (plaintiff's AADEA claims were duplicative of claims under the ADEA and due to be dismissed on summary judgment); *Henry v. Jefferson County Personnel Bd.*, 519 F. Supp. 2d 1171, 1185, 1185-86 (N.D. Ala. 2007), *aff'd on other grounds*, 252 F. App'x 308 (11th Cir. 2007) ("As a threshold matter, the court notes that Plaintiff cannot pursue both of her claims under the Alabama Age Act and the ADEA in this case. . . .  Because the plain language of the Alabama Age Act forces a plaintiff to choose either suit under the ADEA or, in the alternative, suit under the Alabama Age Act, and because Plaintiff in this case has filed suit under the ADEA, the court finds that Plaintiff's claim under the Alabama Age Act is duplicative.") (emphasis omitted), *with Wallace v. Jim Walter Homes, Inc.*, 68 F. Supp. 2d 1303, 1304 (M.D. Ala. 1999) (The AADEA does not preclude "simultaneous pursuit" of AADEA and ADEA claims "in a single forum.").  Defendant does not argue, however, that these claims are duplicative.  As such, the court will not decide whether Plaintiff may pursue his age discrimination claims under both the ADEA and AADEA.  Regardless, under either theory, his claim of age discrimination fails.

2016).  A single-motive, or pretext, case is one where an illegitimate reason, such as race or gender, was the sole motivation for the adverse employment decision.  *Id.*  A mixed-motive case is one where both legitimate and illegitimate reasons motivated the employer's adverse employment decision.  *Id.*  Mixed-motive and single-motive discrimination are not "distinct causes of action" but rather "serve as alternative causation standards for proving discrimination." *Id.* at 1235 n.4.  Here, Plaintiff argues both theories of discrimination.  (Doc. 32 at 9-12).

A plaintiff can establish single-motive and mixed-motive discrimination through direct or circumstantial evidence.  *Quigg*, 814 F.3d at 1235.  It is undisputed there is no direct evidence of discrimination.  The court analyzes single-motive claims based on circumstantial evidence under the familiar *McDonnell Douglas* burden-shifting framework.[19]  *Id.* at 1237 (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)).  The court's analysis for mixed-motive claims based on circumstantial evidence is different. In *Quigg*, the Eleventh Circuit adopted the

---

[19] The court recognizes that in *Sims v. MVM, Inc*., 704 F.3d 1327, 1332–1333 (11th Cir. 2013), the Eleventh Circuit clarified that the *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment in a discrimination case.  *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  Rather, "[t]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Id.*  A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker.  *Id.*; *see generally Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).  Plaintiff has not presented his discrimination claims using the "convincing mosaic."  Regardless, even if the court looks at the evidence through that lens, the court finds that none exists.

mixed-motive framework set forth by the Sixth Circuit in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008). *Id.* at 1239. Under this framework, the court asks, "whether a plaintiff has offered 'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action.'" *Id.* (quoting *White*, 533 F.3d at 400). The court first addresses Plaintiff's discrimination claims under the mixed-motive framework and then moves to the *McDonnell Douglas* framework.

### 1. Mixed Motive Discrimination

Plaintiff purports to bring both his race and age discrimination claims under the mixed motive theory of discrimination. (*See* Doc. 32 at 9-11). While his race discrimination claim can clearly be brought as a mixed-motive claim, *see Quigg*, 814 F.3d at 1237, his age discrimination claim cannot. The mixed motive theory is inapplicable to ADEA claims because a plaintiff must prove that age was the "but-for" cause for the adverse employment action to prevail on a disparate-treatment claim under the ADEA. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009); *see also Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) (recognizing that after *Gross*, there is no such thing as a "mixed-motive" ADEA case because an ADEA plaintiff must establish that he suffered an adverse employment

action "because of" his age).  As such, the court will address the mixed motive theory only as it relates to Plaintiff's race discrimination claims.

As stated above, to survive summary judgment on a mixed motive claim, a plaintiff must show "(1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1232-33 (alteration in original).  To prove race was a motivating factor, a plaintiff must show that the employer's decision would have been different if he belonged to a different race. *Lewis v. Metro. Atlanta Rapid Transit Auth.*, 343 F. App'x 450, 455 (11th Cir. 2009).

Defendant contends that Plaintiff has failed to establish a mixed motive race discrimination claim.  (Doc. 34 at 3-4).  Defendant first argues that the only adverse employment action is Plaintiff's termination.   Second, Defendant contends that Plaintiff cannot prove race was a motivating factor in his termination.  Specifically, Defendant argues that Plaintiff's reliance on evidence of an alleged plot to pile up coachings against him, as well as inadmissible hearsay "falls flat."   (*Id*. at 3). Defendant also highlights the fact that Cizerle, the person whose recommended coaching ultimately led to Plaintiff's termination, did not know Plaintiff's race or age, or any alleged protected activity.  (*Id*. at 4).  The court begins with the alleged adverse employment actions and then moves on to whether Plaintiff created a

genuine issue of material fact as to whether race was a motivating factor with regard to the alleged adverse employment actions.

### i. Adverse Employment Action

"[N]ot everything that makes an employee unhappy" is actionable under federal civil rights statutes prohibiting discrimination in employment. *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004) (quoting *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (citations and quotations omitted)). Rather, while a challenged action need not necessarily have economic consequences, it will be cognizable as unlawful discrimination only if it works "a *serious and material* change in the terms, conditions, or privileges of employment," judged objectively from the perspective of a reasonable employee. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238-40 (11th Cir. 2001) (emphasis original); *see also Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (discussing "material adversity" in the context of Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a)).

Here, Plaintiff contends that each coaching constitutes an adverse employment action because "[e]mployees . . . are on a ladder of automatic termination with four rungs. When coachings accumulated against Plaintiff, . . . the guaranteed result was the tangible, adverse effect of termination." (Doc. 32 at 14). In other words, Plaintiff contends that the Coaching for Improvement policy was

cumulative, thus necessarily making each step an adverse employment action. The court disagrees.

"Negative performance evaluations, standing alone, do not constitute adverse employment action," *Lucas v. W.W. Grainger, Inc*., 257 F.3d 1249, 1261 (11th Cir. 2001), and "courts are wisely reluctant to treat job performance memoranda as actionable . . .where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline," *Davis*, 245 F.3d at 1241; *see also Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006). Likewise, "memoranda of reprimand or counseling that amount to no more than a mere scolding, without any following disciplinary action, do not rise to the level of adverse employment actions" either. *Davis*, 245 F.3d at 1236. Accordingly, "[t]he reprimand of an employee does not constitute an adverse employment action when the employee suffers no tangible harm as a result." *Summerlin v. M & H Valve Co*., 167 F. App'x 93, 97 (11th Cir. 2006); accord *Perry v. Rogers*, 627 F. App'x 823, 832-33 (11th Cir. 2015); *Barnett v. Athens Reg'l Med. Ctr. Inc.*, 550 F. App'x 711, 713 (11th Cir. 2013); *Wallace v. Georgia Dep't of Transp.*, 212 F. App'x 799, 801 (11th Cir. 2006). However, once a negative performance evaluation is used to justify the denial of a raise or some other form of compensation, the evaluation may be deemed an adverse employment action. *See*

*Crawford v. Carroll*, 529 F.3d 961, 971-72 (11th Cir. 2008); *Gillis v. Georgia Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005).

Here, there is no evidence that any of the three coachings, prior to the one that resulted in Plaintiff's termination, amounted to "a serious and material change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1240. The mere fact that the coachings were part of a progressive discipline plan does not necessarily equate with the conclusion that they were adverse employment actions, as argued by Plaintiff. While it is true with the benefit of hindsight that, in this case, each written coaching brought Plaintiff closer to termination, such a conclusion was not an inevitable consequence of every coaching. Job-related criticism, warnings, instructions, evaluations, and/or coachings, such as the ones used here, are meant to prompt an employee to improve his or her performance and lead to a better working environment. In fact, Rogers testified that coaching were used "to help an associate get better, to build themselves on things that they might not be proficient at or maybe doing inaccurately." (Rogers Dep. at 34). Additionally, Plaintiff has not introduced any evidence to show any tangible harm from any of the individual coachings, other than the one that resulted in his termination. For instance, there is no evidence that these coachings had any effect on his pay, benefits, or ability to receive a

promotion.[20]  Nor is there any evidence these coachings resulted in any sort of demotion or were perceived as such.  Notwithstanding all of the above, the court will assume, without deciding, that the coachings were adverse employment actions.

## ii. Motivating Factor

In an effort to establish that race was a motivating factor with regarding to the coachings and his ultimate termination, Plaintiff points to Lewis' alleged plan to get rid of Plaintiff by giving him enough coachings to result in his termination.  (Doc. 32 at 11-12).  The problem for Plaintiff is that there is no admissible evidence that this plan was because of Plaintiff's race.  While there is evidence that Lewis used language such as "white ass," and "white trailer trash" to refer to Caucasian employees, there is also evidence that she used language such as "black ass" to refer to African American employees.  (Rogers Dep. at 25, 52).  And there is no evidence that she used such language in reference to Plaintiff.  Simply put, Plaintiff has failed to present a genuine issue of material fact that race was a motivating factor in any of the coachings or in Plaintiff's termination.  The evidence does not support a finding that Defendant's decisions would have been different if Plaintiff belonged to a

---

[20] The court notes that the Coaching for Improvement program provides that if at any time during a 12-month period an employee had a second or third written level of coaching, that employee "may not be eligible for promotion or transfer."  (Coaching for Improvement at 50).  There is no evidence, however, that Plaintiff's coachings resulted in such revocation of eligibility or that he sought a promotion or transfer.

different race. *See Lewis,* 343 F. App'x at 455. Plaintiff's race discrimination claim fails under the mixed-motive framework.

## 2. Single Motive Discrimination

Title VII, the ADEA, and the AADEA[21] make it unlawful for employers to discharge or otherwise discriminate against an employee because of race and age. 42 U.S.C. § 2000e; 29 U.S.C. § 623(a)(1), Ala. Code § 25-1-22. Absent direct evidence of discrimination, a plaintiff may prove his case through circumstantial evidence using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1087 (11th Cir. 2004). The plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id*. After a prima facie case is established, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087. This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, (1993), and has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co*., 698 F.2d 1138, 1141 (11th Cir. 1993). As long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248,

---

[21] The Alabama Age Discrimination in Employment Act employs the same analytical framework that applies to federal age discrimination claims. *Robinson v. Ala. Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007).

254-55 (1981). After an employer articulates one or more legitimate, non-discriminatory reasons for the employment action, the plaintiff must show the proffered reason was a pretext for illegal discrimination. *Id.* If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Although the burden of production shifts back and forth, the ultimate burden of persuasion remains with the plaintiff. *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).

### a. Prima Facie Case

Defendant contends that Plaintiff cannot establish a prima facie case of race or age discrimination for two main reasons.[22] First, while Sam's concedes the Plaintiff's termination is an adverse employment action, it argues that any pre-termination coaching is not an adverse employment action. (Doc. 26 at 14-15; Doc. 34 at 5-6). Second, Sam's contends that Plaintiff cannot identify a similarly situated comparator that was treated more favorably than he was treated. (Doc. 26 at 16-17; Doc. 34 at 6-9). The court has already addressed the adverse employment action

---

[22] Defendant also argues that Plaintiff was not qualified for the position of supervisor in the Receiving Department. (Doc. 26 at 17). Defendant contends that "as a result of his violation of Sam's Standard of Ethics (Inappropriate Conduct) and its Violence Free Workplace, Plaintiff rendered himself unqualified for the position of supervisor in the Receiving Department." (*Id.*). The court rejects this argument (and notes that Defendant does not revisit it in its reply brief). Cizerle did not recommend termination on the basis of Plaintiff's violation, and if he had no other coachings, Plaintiff would have remained as supervisor in the Receiving Department.

element, and again, assumes without deciding that each coaching, as well as Plaintiff's termination, constitutes an adverse employment action. Therefore, the court moves on to the similarly-situated prong of the prima facie case.

In the en banc decision of *Lewis v. City of Union City*, the Eleventh Circuit acknowledged that its prior decisions attempting to define how similarly situated a plaintiff and her comparator must be had "only sown confusion." 918 F.3d 1213, 1217 (11th Cir. 2019). The Court sought to clarify the proper standard for evaluating the sufficiency of a plaintiff's proffered comparator. *Id*. at 1218-29. In doing so, the court rejected prior language requiring a plaintiff to show that his circumstances and those of another employee were "nearly identical." *Id*. Instead, "a plaintiff proceeding under *McDonnell Douglas* must show that []he and h[is] comparators were 'similarly situated in all material respects.'" *Id*. at 1226. As explained by the Court, the "materially similar" standard provides plaintiffs the opportunity to establish "an inference of unlawful discrimination" but still allows employers the "necessary breathing space to make appropriate business judgments." *Id*. at 1228.

In announcing this standard, the Eleventh Circuit also identified some "guideposts." *Id*. at 1227-28. The court "envision[ed] the sorts of similarities that will, in the main, underlie a valid comparison." *Id*. Typically, a similarly situated comparator will have: (1) engaged in the same basic conduct (or misconduct) as plaintiff; (2) been subject to the same employment policy, rule or guideline as

plaintiff; (3) "ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff;" and (4) share plaintiff's employment or disciplinary history. *Id.* The court reasoned that "a valid comparison will not turn on formal labels, but rather on substantive likenesses." *Id.* "[A] plaintiff and h[is] comparators must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Id.* at 1227 (internal citations and quotation marks omitted).

Plaintiff points to Jimmy Mitchell a comparator. This comparator only relates to one of the coachings at issue -  the one regarding the forklift incident. Plaintiff did not identify any other comparators with the coachings regarding his alleged poor work performance or with the coaching regarding his alleged threatening comment that led to his termination. As such, the court concludes that Plaintiff failed to establish a prima facie case with regard to these three coachings.

Plaintiff also failed to establish that Mitchell is a proper comparator. Plaintiff contends that Mitchell, an African-American supervisor in his thirties, was not issued a written coaching after certifying a forklift driver without Lewis's permission. (Doc. 32 at 15). Plaintiff points to the testimony of Tamla Rogers who stated Mitchell certified people on the forklift without Lewis' approval after she sent the email and that Mitchell was not coached. (Rogers Dep. at 22, 46). The problem with this testimony, however, is that Rogers also testified that she does not have

access to whether or not an employee is coached and does not have access to an employee's coaching history. (*Id*. at 46, 62). As such, Rogers admitted that she "can't say 100 percent" as to whether Mitchell was coached regarding the forklift incident. (*Id*. at 46). There is no other evidence in the record regarding whether or not Mitchell ever certified a forklift driver without Lewis' approval and, if so, whether he was coached. Because of her admission that she did not have access to employee coachings, Rogers' testimony alone is not enough to establish Mitchell as a comparator under the standard set forth in *Lewis*.

Even if the evidence was more solid that Mitchell was not coached for certifying a forklift driver without first gaining the approval of Lewis, there is still not enough information to provide an adequate comparison under *Lewis*. For example, the individual certified by Plaintiff was involved in an accident while driving the forklift. There is no information about the identity of the employee Mitchell allegedly certified or whether or not that individual was involved in a forklift accident. Additionally, there is no evidence that Lewis was aware that Mitchell certified a forklift operator without her approval. Simply put, Plaintiff did not introduce enough evidence to establish Mitchell as a comparator under the standards articulated by the Eleventh Circuit in *Lewis*. Therefore, Plaintiff failed to establish a prima facie case as it relates to the forklift coaching as well.

All that being said, the Eleventh Circuit has stated that even "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (citing *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 182 (1st Cir. 1989)). As such, the court must move on to the pretext analysis.

### b. Legitimate, Nondiscriminatory Reasons and Pretext

Plaintiff does not dispute that Defendant has articulated a legitimate, nondiscriminatory reason for each alleged adverse employment action. (Doc. 32 at 18). The first two coachings were due to Plaintiff's poor performance, the third was for certifying a forklift driver without prior approval, and the final coaching, which led to Plaintiff's termination, was for violating the Statement of Ethics and the Violence Free Workplace policy.

Because Defendant satisfied its burden of production of legitimate, non-discriminatory reasons for Plaintiff's termination, Plaintiff must come forward with evidence sufficient to permit a reasonable fact finder to conclude the reasons Defendant gave were pretextual. *Burdine*, 450 U.S. at 253. Plaintiff may do so by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1348-50 (11th Cir. 2007). Conclusory

allegations of discrimination, without more, are insufficient to show pretext. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). "A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006).

To show pretext, a plaintiff may not merely quarrel with the wisdom of the employer's reason but must meet the reason head on and rebut it. *See Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1264 (11th Cir. 2010); *Chapman*, 229 F.3d at 1034. The inquiry into pretext is based on "the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). As the Eleventh Circuit explained, "to be blunt about it," the inquiry does not center "on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266 (explaining the question is not whether the employee actually had performance problems but "whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints . . . as cover for" discrimination).

As evidence of pretext, Plaintiff points to the same evidence as he did with his mixed motive theory of discrimination. (Doc. 32 at 19). Notably, Plaintiff does not specifically address any of the coachings that led to his termination or the reasons

articulated by Defendant for each coaching and for good reason. In his deposition, Plaintiff essentially admitted that the reasons behind each coaching were legitimate. As to the first two coachings, while Plaintiff may not have believed that the coachings were "fair," Plaintiff admitted that he was not meeting all of Simmons' expectations. (Suggs Dep. at 57-60, 72). Similarly, with regard to the third coaching, it is undisputed that Plaintiff certified a forklift driver without first gaining the approval of Lewis, in direct contravention of Lewis' instructions. (*Id*. at 80-85). In fact, Plaintiff testified that he "was in the wrong in doing this. I made a mistake . . . the one, I accepted. This one was justified." (*Id*. at 85). Finally, with regard to the coaching that resulted in his termination, Plaintiff admitted in his written statement regarding the situation that his comments "sounded threatening." (Doc. 27-2 at 24).

Instead of meeting the reasons for the adverse employment actions head on and rebutting them, Plaintiff maintains Lewis wanted him terminated and used coachings as a way to accomplish this goal. However, glaringly missing from Plaintiff's argument and theory of a plot to terminate him is evidence that he was coached and/or terminated because of his race or his age. A court does not judge whether an employer's decisions are "prudent or fair"; the sole concern is whether unlawful discriminatory animus motivated an employment decision. *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1361 (11th Cir. 1999).

There is simply no evidence to link this alleged plot with illegal race or age discrimination.  While there are isolated racial comments from Lewis, the evidence shows that those comments were about both Caucasian and African Americans.  Her clique of favorite employees contained people of both races and a variety of ages.  Plaintiff's pretext argument also ignores the fact that Cizerle oversaw the investigation and made the recommendation of a "Third Written Coaching"[23] with regard to the comments Plaintiff made to McCann and Caver.  It is undisputed that Cizerle did not know Plaintiff's race or age at the time she made this recommendation.  (Cizerle Decl. ¶ 15).

As to the one comment that Rogers overheard Lewis tell Simmons that Plaintiff "was too old to be doing this job," (Rogers Dep. at 26), there is not enough evidence surrounding the circumstances of this alleged comment to raise an inference of age discrimination with any of the alleged adverse employment actions.  For example, there is no evidence as to when this comment was allegedly said.  Without any context, the comment is too remote and isolated to establish a material fact on pretext.  *See Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (isolated comments unrelated to the termination decision are "insufficient to establish a material fact on pretext").

---

[23]  Use of the term *"Third* Written Coaching" is confusing in this context because it is actually Plaintiff's fourth incident that led to a coaching. However, it is the appropriate term in view of Defendant's Coaching for Improvement plan.  (*See*. Doc. 27-7 at ¶ 12 (italics added)).

In summary, the court concludes that Plaintiff has failed to establish that the reasons for the adverse employment actions were false and that discrimination was the real reason. *Brooks*, 446 F.3d at 1163. His race and age discrimination claims, therefore, fail as a matter of law and Defendant is entitled to summary judgment on these claims.

## B. Retaliation Claims

Plaintiff alleges that he was retaliated against in violation of Title VII. (Doc. 8 ¶¶ 47-53). As in the discrimination context, where proof of retaliatory intent is offered by way of circumstantial evidence, as here, courts apply a burden-shifting scheme analogous to the McDonnell Douglas framework outlined above. *Holifield*, 115 F.3d at 1566; *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-3 (11th Cir. 1994). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* Once the employer proffers a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff to show the legitimate reason was pretext for prohibited retaliatory conduct. *Id.*

Title VII prohibits an employer from retaliating against an employee because (1) "he has opposed any practice made an unlawful employment practice" by the statute, or because (2) "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute. 42 U.S.C.

§ 2000e–3(a).  To establish a prima facie case of Title VII retaliation claim based on circumstantial evidence, Plaintiff must show: (1) he engaged in statutorily protected expression; (2) he suffered a materially adverse employment action; and (3) there is a causal connection between the two events.  *See Crawford*, 529 F.3d at 970; *see also Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 854 (11th Cir. 2010); *Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1277 (11th Cir. 2008). Defendant contends that Plaintiff cannot show that he engaged in statutorily protected activity, and, even if he did, he cannot show a causal connection between that activity and any adverse employment action.  (Doc. 26 at 17-22).  The court agrees.

Defendant first argues that Plaintiff cannot establish that he engaged in any sort of protected activity.  "A plaintiff engages in statutorily protected activity when he complains about an action that he reasonably believed was unlawful under Title VII."  *Banks v. iGov Techs., Inc*., 661 F. App'x 638, 645 (11th Cir. 2016) (citing *Little v. United Techs., Carrier Transicold Div*., 103 F.3d 956, 960 (11th Cir. 1997)). "This standard has both a subjective and an objective component."  *Id*. (citing *Little*, 103 F.3d at 960).  Plaintiff is required to show that he "'subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices' and that 'his belief was objectively reasonable in light of the facts and record presented."  *Id*. (quoting *Little*, 103 F.3d at 960) (emphasis omitted).

Here, there is no admissible evidence that Plaintiff made any sort of complaint of race discrimination that could qualify as statutorily protected activity. For the reasons discussed above, Plaintiff's testimony regarding his telephone conversation with Simmons is inadmissible hearsay. And, even if the court were incorrect in striking Plaintiff's testimony regarding his alleged "words of caution to Lisa Lewis as to her inappropriate and racist comments made to employees," (doc. 32 at 16), this evidence fails to establish that Plaintiff engaged in statutorily protected activity. There is no evidence regarding the context of this conversation. Additionally, Plaintiff's alleged statement that Lewis' comment needed to be rephrased because some employees could construe it as racial discrimination does not establish the objective or even subjective components of statutorily protected activity. Plaintiff's testimony regarding the statement seems to imply that he did not perceive the statement as racially discriminatory. But, again, because Plaintiff does not remember the conversation, the court is left to guess at what was said – something it refuses to do.

Defendant also challenges Plaintiff's retaliation claim on causal connection grounds. To establish a causal connection, a plaintiff must show that the decision makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). To show a causal connection mere temporal proximity

between knowledge of protected activity and an adverse action must be very close. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001). In addition to showing temporal proximity between the protected act and the allegedly adverse employment action, a plaintiff must show that his employer actually knew about the protected activity. *See Clark County*, 532 U.S. at 272.

Even if the court assumes that Plaintiff engaged in protected activity when he allegedly made the statement to Lewis, cautioning her to be careful in how she conveyed a message to other employees, there is absolutely no evidence when this alleged conversation occurred. There is also no evidence regarding the context of this alleged conversation. In fact, Plaintiff does not remember the conversation at all. Without any evidence of the timing or context of the conversation, it is virtually impossible to show that it was in any way related to any adverse employment action. For all of these reasons, Plaintiff's retaliation claim fails as a matter of law. Defendant is entitled to summary judgment on Plaintiff's claim of retaliation in violation of Title VII.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (doc. 25) is due to be granted in full. Defendant's motion to strike (doc. 33) is due to be granted in part and is moot in part. A separate order will be entered.

**DATED** this 2nd day of April, 2020.

_____

**JOHN E. OTT**
Chief United States Magistrate Judge